UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**NORTHGATE LINCOLN-
MERCURY INC.,**

     **Plaintiff,**

                        **Case No. 1:19–cv–769**
     **v.**                    **JUDGE DOUGLAS R. COLE**

**FORD MOTOR COMPANY,**

     **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Ford Motor Company's ("Ford") Motion for Summary Judgment (Doc. 18). For the reasons explained below, the Court **DENIES** Ford's Motion.

## BACKGROUND

**A.    Ford Has Implemented A Ford Courtesy Transportation Program That Provides Monetary Incentives To Ford Dealers Who Use Ford Motor Vehicles As Loaner Or Rental Vehicles.**

When a customer brings his Ford vehicle to a dealer to get it serviced, Ford encourages the dealer to provide the customer with a temporary replacement vehicle (2018 FCTP Manual, Doc. 17-2, at #124). Ford pitches this as a win-win: "Customers get the convenience and experience of driving the latest Ford products while their vehicle is being serviced. Dealerships get the flexibility to satisfy customers in a way that demonstrates that they value their customers' time and appreciate their business." (*Id.*).

Ford incentivizes its dealers to rent service cars to customers through its Ford Courtesy Transportation Program ("FCTP"). This is a voluntary program in which Ford provides monetary incentives to dealers who offer some of the vehicles on their lots as courtesy vehicles for their customers. (Gwaltney Aff., Doc. 17-1 at ¶ 6, #118). There are five separate incentives that a dealer may claim, only three of which are at issue here: (1) the Base Allowance Incentive; (2) the In-Service 30-Day Incentive; and (3) the In-Service 60-Day Incentive. (FCTP Manual, Doc. 17-2, at #129).

In order to claim FCTP incentives on a particular vehicle, the dealer first uses a special code to record the "sale" of the vehicle to the dealership itself in the Ford Motor Company sales software (called Vincent). (*Id.* at #131). When a dealer places a vehicle into service in the FCTP, Ford provides the dealer the Base Allowance Incentive. (*Id.*). The Base Allowance is an amount between $1000 and $3500, depending on the particular model and year of the vehicle. (*Id.* at #130). After a vehicle spends 30 days in service, it qualifies for the In-Service 30-Day Incentive (the "30-Day Incentive"). (*Id.* at #129). And after another 30 days in service, it qualifies for the In-Service 60-Day Incentive (the "60-Day Incentive"). (*Id.*). The 30-Day and the 60-Day Incentives each allow the dealer to earn an additional $250. (*Id.* at #130).

For dealers to earn and retain these incentives, they must comply with the program's terms and conditions. (*Id.* at #127). The FCTP Manual (the "Contract") says that "[v]ehicles that do not meet the program requirements may be removed by Ford Motor Company from the program at any time, and will result in a chargeback for FCTP In-Service incentives." (*Id.*) Questions regarding two program requirements

2

give rise to the dispute in this case. *First*, in order to be eligible for any incentives (i.e., even the Base Allowance), vehicles must accrue at least 20 days *and* 2,000 miles of service in the FCTP (i.e., being used for purposes that qualify under the FCTP). *Second*, rental/loaner agreements with customers for vehicles in the FCTP are valid for only 30 days; thus, "if a customer is in a FCTP vehicle beyond 30 days, a new rental/loaner agreement must be signed." (*Id.* at #127).

Ford reserves the right to audit its dealers who have cars in the FCTP to ensure program compliance. (*Id.*). Ford also retains the right to "cancel, amend, revise and/or revoke any program at any time," and further claims that "[f]inal decisions in all matters relative to the interpretation of any rule or phase of the FCTP rests [sic] solely with Ford Motor Company." (*Id.*).

**B.    Ford Audited Northgate Lincoln-Mercury And Determined Northgate Could Not Substantiate The FCTP Incentives It Had Claimed.**

The dispute in this case arose when Ford charged back one of its dealers, Northgate Lincoln-Mercury ("Northgate"), the FCTP incentives that Northgate had claimed on several vehicles. This occurred after Ford conducted an incentive-payment audit in 2019 and allegedly noticed several irregularities with Northgate's paperwork. For purposes of this suit, the irregularities fall into two basic camps.

**1.    *Ford Claims that Northgate Failed to Obtain a Second Rental Agreement on Certain Vehicles.***

First, Ford claims that Northgate failed to obtain a second 30-day rental agreement on at least 11 cars that Northgate had rented for longer than 30 days, and as to which Northgate had claimed a Base Allowance, and both 30-Day and 60-Day

Incentives. Ford charged back against Northgate all three incentives that Northgate had claimed on those cars.

For its part, Northgate does not dispute that it failed to obtain a second rental agreement. (Compl., Doc. 4, at ¶ 9, #4). Even so, Northgate argues, Ford had no right to charge back *all three* incentives for those cars. Rather, the failure to obtain a second lease meant, at most, that Northgate could not prove usage beyond thirty days. Thus, at most, Ford should have charged back only the 60-Day Incentive. (*Id.*). That is, Northgate claims there is no dispute that each car met the minimum time and mileage rule (20 days and 2,000 miles), which qualified each car for the Base Allowance Incentive. There is also no dispute that each car was in service for at least 30 days and that Northgate obtained an initial rental agreement for each car (valid for those 30 days). Thus, Northgate claims that each car qualified for the 30-Day Incentive, too.

### 2. *On Other Vehicles, Ford Claims that Northgate Could Not Show It Met the 20-day/2,000-mile Minimum Requirement.*

In addition to those eleven cars, Ford also charged back all the incentives that Northgate had claimed on four other cars. According to Ford, Northgate failed to substantiate (through proper rental agreements) that those four cars had satisfied even the 2000-mile minimum needed to qualify for the Base Allowance.

As to those cars, Northgate "concede[s] that it did not produce the appropriate paperwork for" one of those vehicles. (Northgate Resp. Br., Doc. 24, at #202). But for the other three, Northgate claims that it substantiated the mileage requirement using the required rental agreements.

4

3. ***Northgate Sued Ford for Charging Back the Incentives on Those Vehicles.***

On July 17, 2019, Northgate filed a three-count Complaint against Ford in state court, alleging breach of contract, a violation of O.R.C. § 4517.59, and a declaratory judgment claim. As relevant here, the cited statute prohibits auto franchisors from charging back sales or service incentives against dealers (barring certain exceptions). By way of remedy, Northgate seeks damages and attorney's fees (the latter under the statute). Ford removed to this Court under diversity jurisdiction,[1] filed its Answer (Doc. 2), and eventually moved for summary judgment on all counts (Doc. 18). That Motion is now ripe for this Court's decision.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to sua sponte search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996);

---

[1] Diversity jurisdiction is met here because (1) the amount in controversy exceeds $75,000, (2) Northgate is a citizen of Ohio, and (3) Ford is a citizen of Delaware and Michigan. (*See* Notice of Removal, Doc. 1, at ¶¶ 3–4, #1).

5

*Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

### A. The Court Denies Ford's Motion For Summary Judgment On Northgate's Breach-Of-Contract Claim.

Northgate claims that Ford breached the FCTP Contract in two ways: *First*, by charging back Northgate the Base Allowance Incentive, the 30-Day Incentive, *and* the 60-Day Incentive for failing to obtain a second rental agreement on at least 11 that Northgate claims to have rented past 30 days. Northgate argues that, as to those vehicles, at most, Ford should have only charged back the 60-Day Incentive. *Second*, Northgate claims that Ford breached the Contract by charging back all the incentives that Northgate claimed on three cars that Ford claims failed to satisfy the minimum mileage requirement. Northgate argues that those cars *did* in fact satisfy the mileage requirement, and that it provided Ford the proper rental agreements to show that. Ford seeks summary judgment on both of Northgate's theories, and the Court addresses each in turn.

### 1. *General Principles.*

The parties agree that Ohio law controls this contract dispute. To succeed on a breach-of-contract claim under Ohio law, Northgate must establish (1) the existence of a binding contract or agreement, (2) that Northgate performed its contractual obligations, (3) that Ford failed to fulfill its contractual obligations without legal excuse, and (4) that Northgate suffered damages as a result of the breach. *Carbone v. Nueva Constr. Grp.*, L.L.C., 83 N.E.3d 375, 380 (Ohio Ct. App. 2017); *accord Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1265 (Ohio Ct. App. 1996); *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995).

"Under Ohio law, interpretation of written contract terms is a matter of law for initial determination by the court." *Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (citing *Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210 (Ohio Ct. App. 1988)). The "initial determination" calls for the Court to ascertain whether the contract is ambiguous with regard to the dispute at issue. That determination is a question of law. *Id.* ("[T]he determination [as to whether] a contract is ambiguous is made as a matter of law by the court."). If no ambiguity exists, then the Court merely applies the language as written, and there is no need for a fact finder. But, if the Court determines that the relevant contractual language is ambiguous, then the finder of fact must resolve that ambiguity. For making that initial determination, "[a]mbiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Id.*

### 2. *Ford Does Not Have Exclusive Authority to Interpret the Contract*

Before the Court determines whether the Contract is ambiguous, it first addresses a somewhat peculiar argument that Ford makes in passing in its Motion for Summary Judgment. There, Ford essentially claims that the Contract *cannot* be ambiguous in a way that requires jury involvement because the Contract expressly allows Ford itself to resolve any such ambiguity.

More specifically, while admitting that the FCTP Manual constitutes a binding Contract between it and Northgate, (*see* Answer, R. 2, at ¶ 6, #42; Compl., Doc. 4, at ¶ 6, #52), in a footnote in its brief, Ford points to the language noted above that:

"Final decisions in all matters relative to the interpretation of any rule or phrase of the FCTP rests [sic] solely with Ford Motor Company." (FCTP Manual, Doc. 17-2, at #127). Based on that language, Ford argues that "even if some interpretation of the Manual is required, which Ford disputes, that interpretation is within Ford's sole discretion." (Mot. for Summ. J., Doc. 18, at #155 n.2). In other words, Ford is claiming that even if the Contract is ambiguous, there is no need for a fact finder. Rather, the Contract purportedly authorizes Ford to resolve that ambiguity.

If this really were the slam-dunk argument Ford claims, Ford may have wanted to dedicate more than two sentences to developing it, rather than relegating it to a brief footnote. As the Sixth Circuit has explained, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (cleaned up). "Skeletal" aptly describes Ford's argument on this issue, so the Court considers the argument waived.

The argument strikes the Court as potentially problematic in any event. To start, "[a] contract is illusory when, by its terms, the promisor 'retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory.'" *Thomas v. Am. Elec. Power Co.*, No. 03AP-1192, 2005 WL 977057, at *8 (Ohio Ct. App. Apr. 28, 2005) (quoting *Century 21 Am. Landmark, Inc. v. McIntyre*, 427 N.E.2d 534, 534 (Ohio Ct. App. 1980)). "[C]ourts disfavor interpretations that render contracts illusory or

9

unenforceable, and prefer a meaning, which gives the contract vitality." *Id.* (citing *Talbert v. Cont'l Cas. Co.*, 811 N.E.2d 1169 (Ohio Ct. App 2004)). Ford's argument here skirts perilously close to that prohibition. Perhaps Ford could argue that the cited provision includes some tacit limitation on its claimed interpretive powers (e.g., "only reasonable interpretations," or something of the sort). And thus construed, the Contract may not be wholly illusory—which admittedly is a high bar. But that argument would require implying a lot of words that are not currently present in the Contract.

Then there is the separate problem of unconscionability. A contract that says, "you have agreed to whatever we later determine you have agreed to," if not illusory, seems at least to raise both substantive and procedural fairness concerns. Indeed, the provision is not unlike a provision that says, "any disputes under this agreement will be resolved by an arbitrator who is a Ford executive vice president." Surely an arbitration provision that expressly called for a biased decisionmaker would raise serious enforceability concerns. *See, e.g., Hooters of America, Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999) (striking arbitration provision that gave employer unrestricted ability to create biased three-arbitrator panel); *Cheng-Canindin v. Renaissance Hotel Assocs.*, 57 Cal. Rptr.2d 867 (Cal Ct. App. 1996) (striking arbitration provision that called for employer's management personnel to act as arbitrators). At root, though, that is the right Ford is claiming here—the right to decide for itself the meaning of the Contract, just as though it were an arbitrator or other finder of fact on a contract dispute.

10

Ultimately, the Court need not wrestle with the difficult questions that such a provision would present. It is enough to conclude that Ford has waived this argument. And the substantive concerns that the Court raises above are not meant as determinations on those issues. But should Ford seek to press this argument at some later date in this case, Ford would be well advised to meet such issues head on.

### 3. *The Contract is Ambiguous as to the Permissible Chargebacks for Failing to Obtain a Second Rental Agreement.*

Turning to the remaining language in the agreement, Ford argues that the Contract unambiguously allows it to charge back Northgate all three incentives that Northgate claimed for the cars that Northgate purports to have rented past 30 days, but as to which Northgate did not obtain a second rental agreement. In other words, Ford says it had the right to charge back not only the 60-Day Incentive, but also the Base Allowance Incentive and the 30-Day Incentive, even if Northgate met the requirements for those other two incentives.

Ford points to several provisions in the Contract to support this argument. These provisions say that: (1) customers must complete a FCTP rental agreement for each FCTP transaction; (2) FCTP rental agreements are valid for a maximum of 30 days; and (3) "[i]f a customer is in a FCTP vehicle beyond 30 days, a new rental/loaner agreement must be signed." (FCTP Manual, Doc. 17-2, #127). Having highlighted these requirements, Ford then points to this language: "[v]ehicles that do not meet the program requirements may be removed by Ford Motor Company from the program at any time and will result in a chargeback for FCTP In-Service incentives." (Mot. for Summ. J., Doc. 18, #155 (quoting FCTP Manual, Doc. 17-2, #127)). According

11

to Ford, "a chargeback for FCTP In-Service incentives," means a chargeback of *all* such incentives, even incentives as to which the dealer has met the qualifications.

The Court disagrees with Ford that these provisions *unambiguously* provide Ford the right to charge back Northgate all three incentives for failing to obtain a second rental agreement. The cited language does not expressly identify *which* incentives Ford may charge back for *what kind of* violations. Nor do the provisions say that Ford may charge back "*all* incentives" for failing to obtain a second rental agreement in violation of the Contract. The failure to include the word "all" in the cited language contrasts with the contractual language that Ford drafted when discussing the minimum mileage and time requirements. There, the Contract specifically says that "[w]hen a vehicle is removed from service and the mileage and day minimum has not been met, *all incentives will be charged back*." (FCTP Manual, Doc. 17-2, #129 (emphasis added)). But that is the only time that the Contract says that "all incentives will be charged back" for violating a requirement. The contrast in the language used at least suggests the possibility that Ford did not reserve the right to charge back "all incentives" for other types of violations.[2] Thus, based on the "four

---

[2] The provision Ford relies on threatens a "chargeback for FCTP *In-Service* incentives." (FCTP Manual, Doc. 17-2, #127 (emphasis added)). Northgate argues that this chargeback provision does not refer to the Base Allowance Incentive because the FCTP Manual indicates that "In-Service" is not in the title of the Base Allowance Incentive, as it is for "the 30-day In-Service Incentive and the 60-day In-Service Incentive." (*See* Northgate Resp. Br., Doc. 24, #195). The Court is not entirely convinced. The Contract refers to the Base Allowance Incentive as an "in-service incentive" at least once. (*See* FCTP Manual, Doc. 17-2, #129 ("Each quarter Ford Motor Company will provide an up-front FCTP Base Allowance in-service incentive on select models.")). Moreover, the Contract indicates that "in-service" refers to the entire period of time that a car is enrolled in the FCTP program, which necessarily includes the period of time that a car is eligible for the Base Allowance Incentive. (*Id.* at #122). In fairness, though, the use of the capitalized "In-Service" when talking about the incentives to

corners of the agreement," the Court cannot say that the Contract unambiguously compels the reading that Ford proffers. *Potti*, 938 F.2d at 647.

Not only is Northgate's preferred interpretation reasonable in light of the Contract language regarding the chargebacks, but it also seems reasonable when read in light of the FCTP's stated purposes. Indeed, the Court could imagine common-sense reasons why Ford may design the program *not* to include a chargeback of every incentive based on a dealer violating only the second-rental-agreement requirement. Ford does not dispute that the vehicles at issue satisfied all other conditions necessary for Northgate to claim the other two incentives, standing alone. There is no dispute, for example, that the vehicles satisfied the minimum mileage and time requirements necessary to claim the Base Allowance Incentive. Nor is there any dispute that each car was in service for at least 30 days and that Northgate obtained an initial rental agreement (valid for those 30 days). Thus, it is undisputed that Ford achieved, at least in part, the purposes that the parties specified in the FCTP—giving customers the "experience of driving the latest Ford products." (2018 FCTP Manual, Doc. 17-2, at #124). And had Northgate only claimed the Base Allowance and 30-Day Incentive, it is undisputed that Northgate would have been entitled to keep them. It was only because Northgate claimed that it had rented the cars beyond the 30-day

which the chargebacks apply, as opposed to the lowercase description of the Base Allowance as an "in-service incentive," may suggest there is something to Northgate's argument. At bottom, perhaps this all just adds to the ambiguity of the Contract and further counsels against granting Ford summary judgment on Northgate's breach-of-contract claim. Either way, the Court need not rely on Northgate's incentive-label argument because, even without considering it, the Court finds that the contract is sufficiently ambiguous to warrant denying Ford summary judgment, and Northgate has not sought summary judgment based on its argument.

period that Northgate needed to obtain a second rental agreement. So, it would certainly be understandable that Ford would want to charge back the incentive relating to that period of non-compliance: the 60-Day Incentive. But it is less clear why Ford would also want to recoup the incentives relating to the period during which the dealer *was* in compliance with all FCTP requirements: the Base Allowance Incentive and the 30-day Incentive.

None of this is to meant to suggest that it is impossible to read the Contract as adopting Ford's approach. But, given the relevant contract language, read in the context of the goals expressly stated in the FCTP Contract, the Court concludes that the Contract is *ambiguous* on whether failure to meet *one* requirement gave Ford the right to reclaim *all* incentives. Accordingly, the Court **DENIES** Ford summary judgment on Northgate's breach-of-contract claim relating to Northgate's failure to obtain a second rental agreement.

### 4. *There Is a Genuine Dispute of Material Fact as to Whether Northgate Substantiated the Minimum-Mileage Requirement for Three Cars*

Northgate also alleges a breach-of-contract claim based on Ford's chargebacks of all incentives that Northgate claimed on three cars, identified as: (1) VIN 5419, (2) VIN 8414, and (3) VIN 1687. The parties dispute whether Northgate properly substantiated the minimum-mileage requirement for each of these three cars.

Starting with VIN 5419, Ford claims that Northgate supplied "only one rental agreement, with no mileage indicated." (Jones Aff., Doc. 17-3, at ¶ 8, #149). Northgate, by contrast, claims that it provided seven separate rental agreements

14

showing that the vehicle had 2,066 miles of rental use. (Reichert Decl., Doc. 23-1, at ¶ 4, #177).

For VIN 8414, Ford claims that Northgate provided only one rental document, which was again missing mileage information. (Jones Aff., Doc. 17-3, at ¶ 9, #149). Northgate, on the other hand, claims that it produced some fifteen separate rental agreements for this vehicle and that, at the conclusion of those agreements, the vehicle had 2,110 rental miles on it, thereby satisfying the 2,000-mile minimum. (Reichert Decl., Doc. 23-1, at ¶ 5 #177).

Finally, for VIN 1687, Ford claims that Northgate provided only one rental agreement that showed mileage from 46 to 100 miles. (Jones Aff., Doc. 17-3, at ¶ 10, #149). But Northgate claims that it produced two separate rental agreements for this vehicle, and the last rental agreement showed that this vehicle had been driven 2,077 rental miles. (Reichert Decl., Doc. 23-1, at ¶ 6, #177).

As is evident from this description, the parties' representations are contradictory, and they clearly concern a material issue of fact: whether Northgate substantiated the 2000-mile minimum necessary to qualify for the FCTP. This seems a paradigmatic example of the type of dispute in which a court should deny summary judgment and leave it to the fact finder to select among the competing stories.

But there is one potential wrinkle. Although both parties submitted evidence in support of their version of the events, Ford argues that Northgate's evidence doesn't cut it. Ford submitted an affidavit from one of its dealer auditors, Bill Jones, who conducted the audits at issue in this case. Northgate, on the other hand,

submitted a declaration by its general counsel, Robert C. Reichert. Reichert's declaration primarily points to certain documents, which are attached as exhibits to the declaration, that purportedly came from Ford's auditor. The reports appear to list the rental history for each of the vehicles that were included in the auditor's report, along with the dates and miles that the customer drove the car. (*See* Audit Reports, Docs. 23-2, 23-4, at #180–84). According to Reichert, each entry corresponds to a rental agreement that Northgate provided Ford's auditor during its incentive-payment audit.

Ford challenges Northgate's use of these documents in a few ways. First, Ford argues that these lists "do not prove that the relevant rental agreements exist." (Ford Reply Br., Doc. 25, at #218). In other words, a list of agreements, even if allegedly compiled by Ford's auditor, is not the same as the agreements themselves. And, according to Ford, Northgate needs the latter to prevail, but "notably failed to attach them in response." (*Id.*). Second, Ford not only challenges the evidentiary value of the audit reports (and their included lists of agreements), but Ford also challenges their admissibility. More specifically, Ford contends that the information in the documents is hearsay and not admissible under Fed. R. Evid. 803(6).

The Court disagrees with Ford, both on the evidentiary value of Northgate's documents, and also on their admissibility. Start with the latter. Rule 803(6) provides an exception to the general rule making hearsay inadmissible. That exception allows a party to introduce "[a] record of an act, event, condition, opinion, or diagnosis if"

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

16

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness

Fed. R. Evid. 803(6). The audit reports appear to qualify. They were made at or near the time of the audit, by someone with knowledge (the Ford auditor). It appears that at least Northgate (and perhaps Ford) kept copies to document a business activity. Such audit reports seem to be a "regular practice," and Reichert appears to qualify as a custodian. Finally, there is nothing on the face of the documents that appears to indicate "a lack of trustworthiness."

Ford argues for a different result based largely on its view that the documents cannot be "Northgate's business records, as they were not prepared by Northgate, not prepared by an employee of Northgate with knowledge [of] the matters asserted and not kept in the ordinary course of Northgate's business, and therefore, are not admissible evidence as a business record." (Ford Reply Br., Doc. 25, at #218). In other words, Ford argues that the audit reports cannot be *Northgate's* business records, because, at bottom, they are *Ford's* documents. For that reason, says Ford, "the attachments to the Reichert affidavit did not and cannot negate Ford's evidence, may

17

be disregarded under Rule 56(e)(2), and do not create a genuine issue of material fact." (*Id.* at #218–19).

There are two problems with that argument. First, Northgate need not definitively show that the documents are admissible as business records in order to survive summary judgment. The law is clear that the "nonmoving party's evidence need not be in an admissible form" at summary judgment. *Saenz v. Kohl's Dep't Stores, Inc.*, No. 20-1517, 2020 WL 6393335, at *1 (6th Cir. Nov. 2, 2020) (citing *Celotex*, 477 U.S. at 324). Indeed, affidavits themselves are typically not admissible at trial, but Rule 56 specifically provides that courts may consider them on summary judgment. That is not to say that just anything will do—"the party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). In sum, the form in which the evidence is provided at summary judgment need not be admissible, so long as the party opposing summary judgment can show that it likely will be able to present the evidence in an admissible form at trial.

Northgate made that showing here. As noted above, Reichert's declaration seems to show that he (or someone else) *could* testify at trial that: (1) these documents were "made at or near the time by … someone with knowledge"—Ford's auditor; (2) "the record was kept in the course of regularly conducted activity of a business"—an incentive-payment audit; (3) and that the creation of an audit report "was a regular

18

practice of that activity." Thus, there is at least a strong likelihood that they will qualify as business records.

And Ford is wrong to claim that the documents cannot be Northgate's business records because they "were not prepared by Northgate." A party's business records are not strictly limited to documents that the party itself has prepared. The Fifth Circuit's decision in *United States v. Ullrich*, 580 F.2d 765 (5th Cir. 1978), illustrates the point in another case tangentially involving Ford. There, the government was seeking to introduce records it obtained from a Ford dealer in support of its case that the defendant had stolen a vehicle. The defendant objected on the ground that Ford, rather than the dealer, had prepared the documents at issue. The court made short work of that argument:

> Although these documents were furnished originally from other sources, [the dealership manager] testified that they were kept in the regular course of the dealership's business. In effect, they were integrated into the records of the dealership and were used by it. [The court then explained how the dealership used the two kinds of documents at issue in its business operations.]
>
> *We think it obvious that these documents are admissible as business records under Fed.R.Evid. 803(6). They are records transmitted by persons with knowledge and then confirmed and used in the regular course of the dealership's business.* We also consider the documents to have been authenticated properly under Fed.R.Evid. 901. They have all the indicia of trustworthiness that the federal rules require for the admission of hearsay evidence.

*Ullrich*, 580 F.2d at 771–772 (5th Cir. 1978) (emphasis added).

That same analysis applies here. As in *Ullrich*, the document was prepared by "someone with knowledge." And, while Ford baldly asserts, without evidence (or developed argument), that the documents were not kept in the ordinary course of

Northgate's business, Reichert's declaration says otherwise. (*See, e.g.*, Reichert Decl., Doc. 23-1, at ¶ 4, #177 (noting that the auditor's report for VIN 5419 was "a business record of Northgate")). Moreover, the documents were used for the dealership's business purposes—to reconcile payments and credits received from Ford in connection with the FCTP. For present purposes, the Court concludes that Northgate has shown it will likely be able to provide this evidence in an admissible form at trial. Moreover, to the extent there is any doubt on that front, the Court is also mindful that "technical rulings on the admissibility of evidence have no place in a summary judgment procedure" and "that any doubts regarding the admissibility of any evidence should be resolved in favor of admissibility." *Huls v. Freightliner LLC*, No. 1:05-CV-86, 2007 WL 2220492, at *2 (D. Vt. Aug. 1, 2007); *accord United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 304 n.3 (D. Mass. 2018); *Walden v. City of Providence*, 495 F. Supp. 2d 245, 257 n.15 (D.R.I. 2007).

On a related front, even if the Court were to conclude that the proffered documents are not *Northgate's* business records, then presumably Ford's copies of those same documents would be *Ford's* business records. If that is the case, Northgate may well be able to authenticate these documents at trial through Ford witnesses. Accordingly, the Court concludes that Northgate may rely on the audit reports in opposing summary judgment.

Separately, Ford argues that, even if the Court considers the documents, they fail to create a genuine issue of fact. Ford contends, for example, that the documents "do not prove that the relevant rental agreements exist." (Ford Reply Br., Doc. 25, at

20

#218). But it is not Northgate's burden at this stage to *prove* anything. Rather, Northgate must simply create a genuine issue of material fact. And that is what these documents do—they are at least *some* evidence that Northgate provided Ford several rental agreements for each car showing that the cars had met the minimum-mileage requirement.

Nor does it help Ford to point out that other documents (from the same auditor) contradict the information about rental agreements in the audit reports Northgate proffered. In these other documents, the auditor indicates that Northgate is being charged back the incentives Northgate claimed on the cars at issue because the vehicles failed to meet the minimum mileage requirement. But it is hardly surprising that some documents corroborate Ford's reasons for charging back the payments. Indeed, Northgate introduced these documents as evidence of Ford's reasons for charging back the payments in dispute in this case. (*See* Exhibit 1, Doc. 23-6, at #189–90). The thrust of the audit reports is that they contradict, and thus cast doubt on, Ford's stated reasons for charging back some of the payments. The existence of contradictory information tends to create genuine issues of fact, not resolve such issues in favor of one side or another.

Finally, it is worth noting that Northgate may not even need to rely on the reports to create a genuine issue of material fact over whether the cars at issue met the minimum mileage requirement. Reichert's declaration could be read as indicating that Reichert himself can testify from his own personal knowledge that he provided the Ford auditor several rental agreements for each of the cars, and that the mileage

reported on the agreements showed that each car met the 2000-mile requirement. (*See, e.g.*, Reichert Dec., Doc. 23-1, at ¶ 4, #178 ("As set forth in the auditor's own report … the auditor reviewed 7 separate rental contracts for this vehicle and this vehicle was driven a total of 2,066 rental miles.")). To be sure, the Reichert Declaration is not the model of clarity on this point. But it at least suggests that Reichert may have personal knowledge (perhaps from assisting with the audit). If that is the case, then Northgate may have simply offered the reports as further corroboration of Reichert's own testimony. If so, then, with or without the reports, a genuine issue exists as to whether the cars satisfied the minimum-mileage requirement.

In sum, the Court **DENIES** summary judgment to Ford on Northgate's breach-of-contract claims for two reasons. First, the Court concludes that the Contract is ambiguous as to whether Ford could charge back the Base Allowance, 30-Day Incentive, and 60-Day Incentive simply because Northgate failed to obtain a second rental agreement. Second, the Court concludes that genuine issues of material fact exist as to whether Northgate provided rental agreements substantiating that VIN 5419, VIN 8414, and VIN 1687 satisfied the minimum-mileage requirement.

## B. The Court Denies Ford's Motion for Summary Judgment on Northgate's O.R.C. § 4517.59(A)(20) Claim.

Northgate's sole remaining substantive claim asserts that Ford also violated O.R.C. § 4517.59(A)(20)(a) by charging back Northgate the incentive payments at issue. That provision states:

(A) Notwithstanding the terms, provisions, or conditions of any agreement, franchise, or waiver, no franchisor shall:

…

(20) Reduce the amount to be paid to a new motor vehicle dealer, assess any penalty, impose a charge back, or take any other adverse action against a new motor vehicle dealer subsequent to and in relation to the payment of any claim related to a warranty repair or recall reimbursement, sales incentive or rebate, service incentive, or other form of incentive compensation unless either of the following applies:

(a) *The manufacturer shows that the claim lacks material documentation* or is false, fraudulent, or a misrepresentation. A franchisor may not deny a claim based solely on a new motor vehicle dealer's incidental failure to comply with a specific claim processing requirement, such as a clerical error, that does not put into question the legitimacy of the claim.

….

*Id.* (emphasis added)

As with its breach-of-contract count, Northgate separates its claims under O.R.C. § 4517.59(A)(20)(a) into two buckets: (1) Ford's chargebacks relating to Northgate's failure to obtain a second rental agreement for cars that it rented longer than 30 days; and (2) Ford's chargebacks relating to Northgate's purported failure to substantiate the mileage requirements for VIN 5419, VIN 8414, and VIN 1687. Ford seeks summary judgment on both sets of claims, arguing that it was entitled to charge back Northgate under the statute because Northgate "lack[ed] material documentation" to support these payments. O.R.C. § 4517.59(A)(20)(a).

In assessing that argument, the Court takes its definition of "material" from *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182 (6th Cir. 2017), which gave the term in O.R.C. § 4517.59(A)(20)(a) its meaning from "everyday English": "significant, important, [or] of consequence." *Id.* at 188 (quoting Oxford English

23

Dictionary (3d ed. Online version 2017)). Begin with the chargebacks relating to Northgate's failure to provide a second-rental agreement. Ford argues that a second-rental agreement is material because "[a]greements that last longer than 30 days become lease agreements in some states, which in some states, create different insurance requirements." (Gwaltney Aff., Doc. 17-1, #118).

Northgate offers a couple of unavailing counterarguments in response. *First*, Northgate notes that the Sixth Circuit held in *Sims Buick* that the documentation requirement in that case was material because (1) it protected the integrity of the incentive program at issue by helping to prevent abuse or fraud; and (2) it promoted good relations with GM's customers. It then argues that Ford failed to demonstrate that the second-rental-agreement requirement accomplishes either of these goals. But Northgate reads too much into *Sims Buick*. That case never said that a documentation requirement could *only* be material if it served those two interests. It simply listed those two interests as examples of what made the documents in *that* case material. *Sims Buick*, 876 F.3d at 188.

*Second*, Northgate faults Ford for not tailoring its policy as applied to dealers in Ohio based on Ohio's specific insurance requirements. Indeed, it is unclear from the parties' briefs whether rental agreements in *Ohio* turn into lease agreements, or if that is just the case in other states. Regardless, that argument, too, is unavailing. Nothing in the statute says that a document requirement can only be material if it has legal consequences under Ohio law. Nor does Northgate point the Court to any authority holding as much. The statute just requires that the document requirement

24

be "material," meaning: "significant, important, [or] of consequence." And it seems that a document requirement can be "significant, important, [or] of consequence," if it is a standard feature of a *national* program (like the FCTP) that helps ensure compliance with at least *some* States' laws implicated under the program. Otherwise Ford potentially would need to come up with different FCTP rules and procedures for every State in which it operated, a result that undoubtedly would be less efficient and perhaps even cost prohibitive.

Northgate does, however, make a fair point in noting that Ford offered scant evidence in support of its materiality argument. The only evidence Ford cited was a lone paragraph in Gwaltney's affidavit stating that "[a]greements that last longer than 30 days become lease agreements in some states, which in some states, create different insurance requirements." (Gwaltney Aff., Doc. 17-1, at #118). As Northgate notes, that tells the Court almost nothing about how these "different insurance requirements … impact any insurance coverage offered by Ford." (Northgate Resp. Br., Doc. 24, #23).

Ultimately, however, the Court denies summary judgment to Ford on these claims for largely the same reason it denies Ford summary judgment on Northgate's first breach-of-contract claim. Assume for the sake of argument that a second-rental agreement is material documentation for the purpose of claiming the 60-day incentive. Ford never explains how a second rental agreement is material *for the purpose of claiming the Base Allowance Incentive or the 30-Day Incentive*. After all, it appears there is no dispute that, for at least 11 cars, Northgate complied with all the

document requirements in seeking those two incentives under the FCTP. Yet Ford nonetheless charged back Northgate those incentives simply for failing to obtain a second rental agreement—a document that is required only *after* Northgate has met the requirements necessary to become eligible for the Base Allowance and the 30-Day Incentive. The Court needs a better understanding of why Ford considers the second rental agreement to be material to those two incentives. The answer may turn simply on (1) the argument that the documentation is material to the 60-Day Incentive, coupled with (2) Ford's argument—addressed above—that under the FCTP failure to establish entitlement as to *any* claimed incentive for a given vehicle gives Ford the right to reclaim *all* incentives for that vehicle. And, if Ford's argument on the latter point prevails, that two-step argument may mean Ford wins on the statutory claim. But, as noted above, the Court finds there is a genuine dispute as to whether Ford's understanding of its rights under the FCTP is accurate. Accordingly, the Court denies summary judgment to Ford on these statutory claims as to these vehicles, as well.

Separately, Northgate also presses an O.R.C. § 4517.59(A)(20)(a) claim based on Ford's chargebacks relating to VIN 5419, VIN 8414, and VIN 1687. For the statutory claims on these vehicles, Northgate does not question that the relevant rental agreements were material documentation necessary to substantiate the minimum mileage requirement. It simply argues, as above, that it did in fact provide such agreements to Ford. The genuine issue of material fact on that front prevents the Court from granting summary judgment to Ford on this claim, just as on the

26

contract claim for these vehicles. The Court thus **DENIES** Ford's Motion for Summary Judgment on Northgate's O.R.C. § 4517.59(A)(20)(a) claim.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Ford's Motion for Summary Judgment on Northgate's breach-of-contract and O.R.C. § 4517.59(A)(20)(a) claims.

 **SO ORDERED.**

December 17, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

27